I<small>N THE</small> U<small>NITED</small> S<small>TATES</small> B<small>ANKRUPTCY</small> C<small>OURT</small>
<small>FOR THE</small>
S<small>OUTHERN</small> D<small>ISTRICT OF</small> G<small>EORGIA</small>
B<small>RUNSWICK</small> D<small>IVISION</small>

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 CASE |
| | ) | No. 18-20183 |
| CINDY DIANE WALLIN TAYLOR, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| JAYSON BARBER and JACQUELINE BARBER, | ) | ADVERSARY PROCEEDING |
| | ) | No. 18-02005 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CINDY DIANE WALLIN TAYLOR, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION REGARDING
PLAINTIFFS' COMPLAINT TO DETERMINE
DISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(2)(A)**

This matter came on for trial on the Complaint to Determine Dischargeability (A.P. ECF No. 4)[1] filed *pro se* by Jayson and Jacqueline Barber (collectively, the "Plaintiffs") against Cindy Diane Wallin Taylor ("Defendant"), in which Plaintiffs seek a determination that the debt owed to them by Defendant is nondischargeable pursuant to 11 U.S.C.

---

[1] Docket citations beginning with "A.P." refer to the docket in the present adversary proceeding, No. 18-02005. All other citations to the docket refer to the docket in the underlying bankruptcy case, No. 18-20183.

AO 72A
(Rev. 8/82)

§ 523(a)(2)(A).

This action arises out of a contracting dispute between Plaintiffs and Defendant for roofing work. On October 21, 2017, Plaintiffs contracted with Defendant, who operated a roofing business, to install a new roof on their home and to remove a tree from their property following damage caused by Hurricane Irma. (A.P. ECF No. 4 at 1.) Plaintiffs allege that they paid Defendant $3,400 for the work, but she never performed any services at their residence. (Id.) Further, they allege Defendant engaged in "pre[-]meditated theft" of their money because she closed her bank account and her business within days of accepting their payment. (Id.) In sum, Plaintiffs allege that Defendant obtained their $3,400 payment by false pretenses, false representation, or actual fraud, and such debt should be excepted from discharge.

The Court has fully considered the pleadings and other papers submitted by the parties, as well as testimony and documentary evidence entered into the record at the trial, and the relevant law. For the reasons set forth below, judgment will be entered in favor of Plaintiffs as the Court finds that Plaintiffs have proven by a preponderance of the evidence that the debt at issue should be excepted from discharge.

FINDINGS OF FACT[2]

Background

When Hurricane Irma struck southeast Georgia in 2017, Plaintiffs' roof was damaged and there seemed to be some water damage on the interior of their home. As a result, Plaintiffs entered into an agreement with Defendant, doing business as Taylor on Top, under which Defendant would provide Plaintiffs with certain services related to replacing the roof. (Pl.'s Ex. 3; Pl.'s Ex. 4; Pl.'s Ex. 5; A.P. ECF No. 96 at 13, 34.) The Defendant personally inspected Plaintiffs' roof and prepared the invoice that memorialized their agreement for the subject roofing work. (A.P. ECF No. 96 at 20.) The invoice, dated October 21, 2017, provided that Defendant would replace Plaintiffs' roof with a metal roof; remove and replace the decking around the chimney and the chimney collar; remove a tree from near the house on the property; and, upon request, provide dehumidifiers as part of the work. (Pl.'s Ex. 1.) The work was to be completed for $3,400.[3] (Id.) At the bottom of the invoice, Defendant drew a star and wrote "All Done Based on Ins – ." (Pl.'s Ex. 1.) While the Plaintiffs' interior damage was not included in the invoice (A.P. ECF No. 96 at 18, 26, 72, 98), Defendant intended to negotiate with Plaintiffs'

---

[2] The Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52, made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7052.

[3] According to Defendant, the $3,400 invoice was based on the amount that the insurance company had already given to Plaintiffs to fix the roof damage. (Id. at 36-37.)

insurance company on Plaintiffs' behalf to make a claim to obtain further funding in excess of the $3,400 for the alleged water damage and mold on the interior of the home.[4] (Id. at 18, 21, 25-27, 33, 72, 93.)

On October 24, 2017, Plaintiffs wrote a check to Defendant in the amount of $3,400; and, at Defendant's direction, Plaintiff, Jacqueline Barber ("Mrs. Barber"), wrote "Materials" and her address on the "for" line at the bottom of the check. (Id. at 22, 37.) Defendant deposited the check into her bank account the same day. (Pl.'s Ex. 2.)

At some point thereafter, Defendant met with an insurance adjuster at Plaintiffs' home. (A.P. ECF No. 96 at 18, 34, 41.) Additionally, Defendant rented and arranged for dehumidifiers to be placed in Plaintiffs' home to dry out interior damage. (Id. at 22-23, 39.) Dehumidifiers were delivered by ServiceMaster and placed in Plaintiffs' home for four days in November 2017. (Id. at 22.) Defendant also covered parts of the roof with felt paper to prevent it from leaking until it could be replaced.[5] (Id. at 16-17, 37-38, 40.) After installing the felt paper, Defendant performed no more work on Plaintiffs' home.[6] (Id. at 18-19, 39.) Defendant did not obtain any additional funding from Plaintiffs' insurance

---

[4] Both Mrs. Barber and Defendant testified that Plaintiffs' insurance policy included a clause that provided up to $10,000 to remediate and repair interior water damage and mold. (Id. at 18, 25-27, 72.)

[5] Defendant testified that there would be a six-month delay in replacing Plaintiffs' roof because she had so many jobs to complete ahead of Plaintiffs' roof. (Id. at 34.) Plaintiffs did not dispute this.

[6] At trial, there was contradictory testimony about whether a tarp was installed on the roof. Defendant testified that she put a tarp on part of Plaintiffs' roof. (Id. at 38.) However, Mrs. Barber testified that there was discussion about putting a tarp on the house, but that it never occurred. (Id. at 16.) With respect to this issue, the Court finds Mrs. Barber's testimony credible.

company. (Id. at 71-72.)

Defendant stopped communicating with Plaintiffs in November 2017. (See generally Pl.'s Ex. 6; A.P. ECF No. 96 at 17-18.) By December 2017, and after receiving no response to Plaintiffs' many attempts to follow up with Defendant for a status update on the roofing work, Plaintiffs concluded that Defendant would not complete the roofing work and subsequently arranged for another roofing company to replace their roof. (Pl.'s Ex. 8; A.P. ECF No. 96 at 17-18.) Plaintiffs demanded a full refund for the $3,400 they paid to Defendant. Defendant did not issue any refund to Plaintiffs.[7] (A.P. ECF No. 96 at 6, 12, 18, 48.)

Credibility of the Witnesses

The Court finds that Defendant is not a credible witness. During her testimony at trial and as described more fully below, she gave answers which directly contradicted prior testimony she had given earlier in the trial, and her testimony was largely self-serving. Whereas, the Court finds Mrs. Barber's testimony very credible and gives

---

[7] Defendant was asked: "When they asked you for the money back, what did you tell them?" Defendant answered:

> I didn't know what to say, but I knew that the money that they had paid in to me had been spent. I was trying to appease them, trying to keep her from being upset because I had already explained to her on site twice that her roof wouldn't be done immediately, that she would be 6 to 9 months out. That was in October.

(A.P. ECF No. 96 at 48.)

substantial weight to her testimony.

Evidence of Intent

Based on Defendant's own testimony, at the time she quoted the cost of the work to Plaintiffs and prepared the invoice, Defendant knew that she could not perform the work provided on the invoice for $3,400 and that the cost of such work would exceed $3,400 but invoiced that amount to Plaintiffs anyway for the full roofing job.[8] (Id. at 33, 47-48, 71.) Furthermore, Defendant's inconsistent testimony showed that at the time Defendant received and cashed Plaintiffs' check, she did not intend to perform the services included on the invoice for the amount listed on the invoice, nor did Defendant intend to supply Plaintiffs with the materials to replace her roof. Rather, Defendant intended to do the work only if and when additional insurance proceeds were paid for the interior repairs.

Defendant's concealment of the fact that she would perform the roofing work only upon receiving additional insurance proceeds is clear from her inconsistent and self-serving testimony. Mrs. Barber testified that she believed that the check paid for all labor and materials related to the work listed on the invoice, while Defendant testified that she directed Mrs. Barber to write "Materials" on the check because it was for materials. She

---

[8] Defendant testified that she had 27 years of roofing experience. (Id. at 32.) She also testified that all the work listed on the invoice would have cost upwards of $14,000-$15,000; but she listed $3,400 on the invoice because that is the amount of money Plaintiffs had received from their insurance company. (Id. at 33, 36.) She even went on to admit that the metal roofing alone would cost more than $3,400. (Id. at 63-64.)

went on to explain that the check was to pay her $1,000 to negotiate with the insurance adjuster, and that the remaining $2,400 was only for materials and labor used to secure the damaged roof until the new roof could be installed. (Id. at 10, 33-34, 46-47, 84.) However, Defendant later contradicted herself and testified that she planned to do all of the work listed on the invoice for $3,400 and was going to give the materials to Plaintiffs out of "goodwill."[9] (Id. at 36, 46-47.) And upon further questioning, Defendant finally admitted that the check was payment in full for the labor and materials listed on the invoice. (Id. at 70.) The Court is unmoved by Defendant's testimony regarding her own beneficence. Rather, the evidence indicates that Defendant did not intend to perform the services promised for the amount listed on the invoice.

While Mrs. Barber did testify that Defendant was hired to replace the roof and deal with her insurance company, Mrs. Barber did not recall a specific amount paid to Defendant as being earmarked for Defendant conducting the negotiations with the insurance company. Rather, it was her understanding that this service was done as a matter of course by Defendant. (Id. at 89-90.) She also testified that any additional money from the insurance company would be for repairs to the interior due to mold, not for the roofing project. (Id. at 98.) Defendant corroborated Mrs. Barber's testimony that the

---

[9] In addition to her testimony that she was planning on giving the roofing materials to Plaintiffs, Defendant submitted Proposed Findings of Fact in which she asserts that she was not going to charge Plaintiffs for materials, but she was going to "donate" them to Plaintiffs. (A.P. ECF No. 76 at 1.)

AO 72A
(Rev. 8/82)

ongoing negotiations with the insurance company related to the interior and any additional insurance money would be for repairs to the interior:

> Q: And you were trying to get them more?
> A: That's correct.
> Q: How much more?
> A: I was trying to get them their mold and med— the mold and mildew claims so that they would receive the extra 10- to 15,000.
> Q: And that would have paid your profit to do the roof?
> A: Yes, sir.

(Id. at 76.)

Further, Defendant testified that she cashed Plaintiffs' check the same day "because I had to put the money back for the materials and for the dehumidifiers."[10] (Id. at 74.) However, the evidence indicates that Defendant could not have cashed the check to reimburse herself. The dehumidifiers were not requested until sometime after October 26, 2017, and not delivered until sometime after November 3, 2017. (Pl.'s Ex. 6.) Additionally, the felt installation was determined to be necessary *after* the check had been deposited and did not occur until sometime in November. (A.P. ECF No. 96 at 23, 92; Pl.'s Ex. 6.)

Defendant also prepared the invoice and deposited Plaintiffs' check knowing that she was in dire financial straits and did not intend to use the proceeds of the check on

---

[10] Defendant gave inconsistent testimony about how much the dehumidifiers and felt cost. At first, she said she couldn't recall and then she gave different amounts. She also testified that she no longer had access to most of her business records from 2017 and 2018. (Id. at 39, 45.) The Court finds her testimony on the costs associated with the dehumidifiers, felt installation, and other materials provided to Plaintiffs to lack credibility.

materials for Plaintiffs' job. At some point in the last quarter of 2017, Defendant became aware that she was experiencing serious financial difficulty. While Defendant was not consistent with the dates on which certain circumstances occurred during this time, it is clear from the circumstances she described that her difficulties arose in October 2017.[11] Defendant's gallbladder ruptured some time after October 24, 2017, but before November 3, 2017. (Pl. Ex. 6.) Defendant testified that she didn't finish Plaintiffs' job because she became bedridden due to stress over $172,000 that she alleged she was owed by various insurance companies and clients for work she had already completed, and that she suffered a nervous breakdown as a result.[12] (A.P. ECF No. 96 at 42-43.) Defendant also testified that she accepted no more contracts for work after the end of October 2017. (Id. at 78-79.) Subsequently, the bank closed her account and her business closed in January 2018. (Id. at 19-20, 51, 78.)[13] Additionally, Defendant testified that she was admitted to a

---

[11] Defendant testified that all her troubles began in October 2017. (Id. at 42.)

[12] Defendant was adamant that she was owed $172,000 and became bedridden in late October 2017. But when pressed about that timing in relation to the date she entered into the agreement with Plaintiffs, she revised her testimony and could not remember when she became aware of the $172,000 amount outstanding; and she also attempted to dial back the $172,000 amount by saying that she could not exactly remember the amount without her records – which had all been destroyed or thrown away while she was seeking treatment for her nervous breakdown. (A.P. ECF No. 96 at 42-44, 64-65.) While Defendant said she did not know about her financial difficulties when she made the agreement with Plaintiffs, she did admit that "[i]t was just – we had people that were supposed to pay us at certain times of the month, and we weren't getting payment. It was a nightmare." (Id. at 66.) The Court does not make any findings or conclusions about the amount owed to Defendant by third parties. Rather, the Court is persuaded by Defendant's testimony that she was experiencing some financial difficulties during that time.

[13] Defendant testified that "[m]y bank account actually closed on the roofing company, I think it was, January the 17th or 18th. Greg Strickland [bank president] had to go ahead and close everything down because there was no way to keep going." (Id. at 51.)

facility to treat her stress sometime in January 2018. (Id. at 44.) Based on the events Defendant described, it follows that at the time she entered into the agreement with Plaintiffs, Defendant was experiencing significant financial difficulties which led to her health issues and ultimately to the closure of her business and her chapter 7 bankruptcy filing on March 20, 2018. (ECF No. 1.)

## CONCLUSIONS OF LAW

Debts "for money, property, services . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition" are nondischargeable. 11 U.S.C. § 523(a)(2)(A). The plaintiff bears the burden of establishing nondischargeability under section 523(a)(2) and exceptions to discharge are construed narrowly. In re Wood, 245 F. App'x 916, 917 (11th Cir. 2007). "[C]ourts generally construe the statutory exceptions to discharge in bankruptcy liberally in favor of the debtor, and recognize that the reasons for denying a discharge . . . must be real and substantial, not merely technical and conjectural." Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994) (internal citations and quotations omitted).

To establish that a debt is excepted from discharge under section 523(a)(2)(A), a plaintiff must show by a preponderance of the evidence the elements of common law fraud; in other words, a plaintiff must prove that "(1) the debtor made a false

representation with intent to deceive the creditor; (2) the creditor [justifiably] relied on the representation; and (3) the creditor sustained a loss as a result of the representation." In re Bilzerian, 100 F.3d 886, 892 (11th Cir. 1996).

To satisfy the first element, the creditor must prove that a debtor used false pretenses, made a false representation, *or* committed actual fraud to obtain a debt with the intent to deceive the creditor. See Harris v. Jayo (In re Harris), 3 F.4th 1339, 1344-45 (11th Cir. 2021) (noting a creditor may prove a debtor used false pretenses, made a false representation, *or* committed actual fraud to obtain a debt to prove the first element of section 523(a)(2)(A)). A statement made with "reckless indifference to the truth" satisfies section 523(a)(2)(A). Duncan v. Bucciarelli (In re Bucciarelli), 429 B.R. 372, 375 (Bankr. N.D. Ga. 2010). While a false representation is an express representation, "[f]raud may [also] consist of silence, concealment or intentional non-disclosure of a material fact, as well as affirmative misrepresentation of a material fact." Id. "Actual fraud" as used in section 523(a)(2)(A) means "any fraud that involves moral turpitude or intentional wrong" which is "done with wrongful intent." Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581, 1586 (2016). Section 523(a)(2)(A) "prevents the discharge of all liability arising from fraud," other than liability for a statement respecting a debtor's financial condition or one in writing, which is covered by section 523(a)(2)(B). Harris, 3 F.4th at 1345 (citing Cohen v. de la Cruz, 523 U.S. 213, 215 (1998)).

Importantly, "[t]he representation at issue must relate to existing or past facts, as opposed to mere speculations or declarations about future events." Klamfoth v. Kirkland (In re Kirkland), No. 12-71914-WLH, Adv. Proc. No. 12-5625, 2015 WL 457862, at *3 (Bankr. N.D. Ga. Jan. 21, 2015). A representation about future actions may be a false representation under section 523(a)(2)(A) only with "a showing the debtor *never intended to perform the future act* at the time the statement was made." Id. (emphasis added); see also Mack v. Mills (In re Mills), 345 B.R. 598, 604 (Bankr. N.D. Ohio 2006) (stating fraudulent intent under section 523(a)(2) "hinges on whether the debtor, at the time the debt was incurred, intended to honor the obligation").

Intent to deceive a creditor may be inferred from the totality of circumstances. Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1375 (10th Cir. 1996); Ins. Co. of N. Am. v. Cohn (In re Cohn), 54 F.3d 1108, 1118-19 (3d Cir. 1995); In re Miller, 39 F.3d at 305; Cent. Credit Union of Ill. v. Logan (In re Logan), 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005) (intent to deceive may be inferred based on a "picture of deceptive conduct" by debtor). Determination of a debtor's intent to deceive is "largely an assessment of the credibility and demeanor of the debtor," in addition to inferences made based on circumstantial evidence. Navy Fed. Credit Union v. Purse (In re Purse), 537 B.R. 28, 37 (Bankr. S.D. Ga. 2015) (citing Miller, 39 F.3d at 305).

The second element, a creditor's justifiable reliance on the debtor's fraudulent

representation, "is gauged by an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." City Bank & Trust Co. v. Vann (In re Vann), 67 F.3d 277, 283 (11th Cir. 1995) (internal quotations omitted). "[I]t is only where, under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." Id. And finally, Plaintiffs must prove the third element of a claim under section 523(a)(2) which is that they suffered loss as a result of the false representation. Bilzerian, 100 F.3d at 892.

Here, Plaintiffs have successfully carried their burden of proving the requisite elements of nondischargeability under section 523(a)(2).

a. False representation

The first element Plaintiffs must prove under section 523(a)(2) is a false representation made with an intent to deceive them. Bilzerian, 100 F.3d at 892. Plaintiffs have shown that in October 2017, they contracted with Defendant for roofing work and tree removal and Defendant failed to complete the work or provide them a refund. Defendant told Plaintiffs that the roofing work and tree removal would cost $3,400 and

prepared and provided them an invoice to that effect. However, the only work Defendant performed under the invoice was in providing dehumidifiers at Plaintiffs' home in November 2017. Most importantly, they have shown that *at the time of contracting*, Defendant knew that the cost of the work she listed in the invoice would far exceed $3,400, and nonetheless, she still provided them the artificially low amount of $3,400 for the entire roofing job. Defendant never intended to perform the promised work on the invoice for $3,400 and planned to perform the work only if she could obtain more money from Plaintiffs' insurance company.

The Court comes to this conclusion after Defendant testified extensively regarding her business. Of particular note to the Court is that Defendant testified that she knew that $3,400 would not cover her costs and without more money from the insurance company, she would lose $10,000 on the job for Plaintiffs. (A.P. ECF No. 96 at 47-48). However, she insisted she intended to perform the work even at a loss out of "goodwill," and claimed she lost money on other clients in the past. (Id. at 63-64, 76.) Defendant's self-serving insistence of her own charity beggars belief and the Court finds her testimony not credible. Defendant's testimony was also largely inconsistent with respect to many issues including what was paid for by the check Mrs. Barber gave her and how much the dehumidifier and felt paper cost. See supra pp. 6-8, fn.10.

Additionally, Defendant testified that she intended to submit change orders after

AO 72A
(Rev. 8/82)

the invoice as the work was performed. (Id. at 71.) The Court infers from this testimony that Defendant created an artificially low invoice for $3,400 and planned to later revise the costs of the work through change orders. This, coupled with Defendant's repeated admission that the cost of the work on the invoice would exceed $3,400, demonstrates to the Court a pattern of misleading business practices in connection with Defendant's contracting with Plaintiffs.

The Court also finds Defendant's credibility lacking regarding the solvency of her business. First, the Court does not find credible Defendant's self-serving testimony that she was solvent. Additionally, Defendant testified that she was owed $172,000 in unpaid "insurance money" from other roofing jobs in October 2017, the same month she contracted with Plaintiffs. (Id. at 42.)[14] She also stated that she lost money on other roofing clients and was willing to lose $10,000 to perform the roofing work for Plaintiffs. (Id. at 63-64, 72.) Based on (1) Defendant's lack of credibility; (2) the $172,000—or some substantial amount—owed to Defendant at the time she contracted with Plaintiffs; (3) Defendant suffering losses on other jobs and claiming a willingness to lose money on Plaintiffs' job, evidencing poor business sense; (4) Defendant taking on no more clients after October 2017 (Id. at 78-79); and (5) the closure of Defendant's business bank account

---

[14] While Defendant testified that she was owed $172,000 in October 2017, she contradicted herself later and stated she did not know what she was owed in October 2017. (Id. at 65.)

AO 72A
(Rev. 8/82)

at some time between the date of contracting with Plaintiffs on October 24, 2017, and January 2018,[15] the Court concludes that Defendant was not in a financial position to perform her obligations under the invoice dated October 24, 2017, and knew of this fact when she accepted such obligations. She promised to do so in order to fraudulently obtain payment from Plaintiffs without intent to perform for the amount she charged Plaintiffs: $3,400.

For all the reasons stated above, the Court finds that Plaintiffs have proven that Defendant made a false representation with the intent to deceive Plaintiffs. Specifically, they have shown that *at the time of contracting*, Defendant knew that the cost of the work she promised to perform would far exceed $3,400, and yet still falsely represented the cost of the roofing job. Furthermore, based on a totality of the circumstances, they have shown that Defendant never intended to perform the work on the invoice for $3,400.

b. Justifiable reliance

The second element of a claim under section 523(a)(2) is the creditor's justifiable reliance on the false representation. Bilzerian, 100 F.3d at 892. The Court finds that

---

[15] It was shown at trial that Defendant's company bank account was closed at some point between October 24, 2017, and January 2018. (Id. at 15, 78.) However, the Court is without credible evidence from either party to determine the precise timing of its closure.

Plaintiffs were justified in relying on Defendant's false representation that she would perform the roofing job for $3,400. Plaintiffs are not roofing experts and there is no evidence in the record to suggest they should have questioned or investigated Defendant's statements regarding the cost of the roofing job. See Vann, 67 F.3d at 283 ("[I]t is only where, under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.").

    c. Damages

The third and final element of a claim under section 523(a)(2) is the creditor's loss as a result of the false representation. Bilzerian, 100 F.3d at 892. Plaintiffs have satisfied this final element. The Court finds Plaintiffs' evidence and testimony regarding their loss credible, while Defendant's attempts to dispute Plaintiffs' loss not so. Plaintiffs paid Defendant $3,400 based on Defendant's false representation that she would perform the roofing job provided for in the invoice for $3,400. Defendant also failed to perform the work for which Plaintiffs paid $3,400. (Pl.'s Ex. 1.) Furthermore, Plaintiffs were unable to apply the $3,400 that the insurance company paid them to the $5,500 that they paid to the vendor who actually replaced the roof. (Pl.'s Ex. 8, 9.)

In sum, the Court finds Plaintiffs have proven by a preponderance of the evidence that Defendant made a false representation with intent to deceive Plaintiffs; that Plaintiffs justifiably relied on the false representation by Defendant; and Plaintiffs sustained a loss as a result of the false representation. Accordingly, Plaintiffs have shown that the debt to Plaintiffs incurred by Defendant in the amount of $3,400 is nondischargeable.

A judgment consistent with these Findings of Fact and Conclusions of Law will be entered on the docket simultaneously herewith.

Michele J. Kim
United States Bankruptcy Judge
Southern District of Georgia

Dated at Brunswick, Georgia,
This 31st day of March, 2022.